875 So.2d 1083 (2004)
MISSISSIPPI COMMISSION ON JUDICIAL PERFORMANCE
v.
Former Judge U.U.
No. 2002-JP-01912-SCT.
Supreme Court of Mississippi.
June 24, 2004.
*1085 Luther T. Brantley, III, attorney for appellant.
Trent Walker, Edward Blackmon, Jr., Canton, attorneys for appellee.
CARLSON, Justice, for the Court.
¶ 1. The Mississippi Commission on Judicial Performance (Commission) filed a Formal Complaint charging former Chancery Court Judge U.U. with judicial misconduct constituting willful misconduct in office, willful and persistent failure to perform judicial duties, and conduct prejudicial to the administration of justice which brings the judicial office into disrepute, thus causing such alleged conduct to be actionable pursuant to the provisions of Article 6, Section 177A of the Mississippi Constitution. The judge responded and a hearing on the complaint was held before a three-member Committee. Subsequently, the Committee issued Findings of Fact and Conclusions of Law recommending that this Court publicly reprimand the judge, impose a fine in the amount of $500.00, and tax costs of the proceedings in the amount of $953.95. Specifically, the Committee found that the judge violated Canons 1, 2(A), and 3 of the Mississippi Code of Judicial Conduct, thus causing such conduct to be actionable under Article 6, § 177A of the Mississippi Constitution. In due course, the Commission voted to adopt the findings of the Committee. The Commission filed with this Court the Commission record and its findings and recommendations. Miss. Const. art. 6, § 177A; Miss. Comm'n on Jud. Perf. R. 10; M.R.A.P. 16(d).

FACTS
¶ 2. Within approximately a one-year period, the Commission received seven citizens' *1086 complaints concerning delays by the judge in rendering opinions and orders in six different cases. The first complaint was received in February of 2000. Two more complaints were received in May, one in June, and two in August. The Commission also received one complaint in February, 2001. The complaints involved several types of cases and constituted the basis of the complaints against the judge.
¶ 3. The case listed in Count One of the Complaint was an irreconcilable differences divorce case. The judge conducted a hearing on August 29, 2000, after which the divorce was granted, but the judge took the contested issues of child support, property rights, alimony, and financial issues under advisement. The citizen's complaint was received on February 27, 2001, and a final order was entered on November 20, 2001. The length of time between the hearing and final order was approximately fifteen months.
¶ 4. The case listed in Count Two of the complaint concerned the administration of a decedent's estate. After conducting a hearing on a petition to close the estate on November 10, 1999, the judge did not enter a final judgment in this case until October 6, 2000; almost eleven months later. The citizen's complaint was received by the Commission on May 30, 2000.
¶ 5. The case listed in Count Three of the Complaint involved an action to set aside a deed. Trial was held on December 13, 1999, the judge took the case under advisement, and a final order was not entered until December 21, 2000. Over twelve months passed between trial and final judgment, and the Commission received the citizen's complaint on August 14, 2000.
¶ 6. The case listed in Count Four of the Complaint was an estate matter. After removing the executor of the estate on November 16, 1999, the judge conducted a hearing on a petition to appoint a new executor, one week later, on November 23, 1999. After that, a citizen's complaint was received by the Commission on June 21, 2000. A final order appointing a new executor was entered on August 11, 2000. The length of time from the removal of the executor until the appointment of a new executor was approximately nine months.[1]
¶ 7. The case listed in Count Five was a suit to confirm tax title. Both parties filed motions for summary judgment and presented arguments, which the judge heard on April 5, 1999, at which time the judge took these motions under advisement for a subsequent ruling. A citizen's complaint was received by the Commission on February 17, 2000. An order denying both motions for summary judgment was entered by the judge on March 31, 2000, approximately twelve months after the motions were taken under advisement. The parties were apparently unaware of the fact that the order had been entered because the complaint was refiled with the Commission on August 4, 2000, after the order had been entered.
¶ 8. The case listed in Count Six and was an uncontested petition for adoption of a child by the maternal grandparents. A hearing was held on this matter on January 10, 2000, and a citizen's complaint was received by the Commission on May 22, 2000. A final Judgment of Adoption was entered on June 27, 2000. At the Committee hearing, the judge testified that the final adoption order prepared and submitted by the petitioners' counsel had numerous *1087 defects which had to be corrected by the lawyer before entering it as the order of the court. The judge further testified that the attorney failed to submit an appropriate amended order until the day the citizen's complaint was received, at which time the judge contacted the attorney about the case. The judge corrected the order the attorney supplied that day and entered it as the final judgment. Approximately five and one-half months elapsed between the hearing and entry of judgment.

DISCUSSION
¶ 9. We review judicial disciplinary matters under a de novo standard, though the findings of fact and recommendations of the Commission are carefully reviewed. In a judicial disciplinary proceeding, this Court must conduct an independent inquiry and make its own final determination of the appropriate sanction, although the Court accords careful consideration to the findings of fact and recommendations of the Commission on Judicial Performance or its committee. Miss. Comm'n on Jud. Perform. v. Hartzog, 822 So.2d 941, 943 (Miss.2002) (citing In re Anderson, 412 So.2d 743, 746 (Miss.1982)). See also Miss. Comm'n on Jud. Perform. v. Spencer, 725 So.2d 171, 174 ¶ 6 (Miss. 1998). This Court has the power to impose sanctions when based upon clear and convincing evidence. Miss. Comm'n on Jud. Perform. v. Wells, 794 So.2d 1030, 1032 ¶ 5 (Miss.2001).

I. WHETHER THE JUDGE BREACHED THE DUTIES AS A CHANCERY JUDGE AS IMPOSED BY MISS. CONST. ART. 6, § 177A AND THE MISSISSIPPI CODE OF JUDICIAL CONDUCT.
¶ 10. After hearing the evidence, the Commission found that the judge's conduct was actionable under Miss. Const. art. 6, § 177A, and was in violation of Canons 1, 2(A), and 3(A)(4) & (5) of the Mississippi Code of Judicial Conduct by the repeated failures in entering orders and opinions in a timely fashion. While the judge's conduct was alleged to be actionable under subsections (b), (c), and (e) of art. 6, § 177A of the Mississippi Constitution, neither the Committee nor the Commission made any findings with respect to subsection (c): willful and persistent failure to perform duties of office. The Commission did find, however, that the judge's conduct was actionable under subsections (b) and (e). Whether the judge's conduct violated the cited canons thus bringing such conduct under the constitutional provisions is the focus of our discussion set out below.

A. ARTICLE 6, § 177A, MISSISSIPPI CONSTITUTION
¶ 11. Article 6, Section 177A of the Mississippi Constitution provides:
On recommendation of the commission on judicial performance, the supreme court may remove from office, suspend, fine or publicly censure or reprimand any justice or judge of this state for:... (b) willful misconduct in office; (c) willful and persistent failure to perform his duties; ... or (e) conduct prejudicial to the administration of justice which brings the judicial office into disrepute....
Miss. Const. art. 6, § 177A. This Court has defined the phrase "willful misconduct in office" as follows:
Willful misconduct in office is the improper or wrongful use of power of his office by a judge acting intentionally or with gross unconcern for his conduct and generally in bad faith. It involves more than an error of judgment or a mere lack of diligence. Necessarily, the term would encompass conduct involving moral turpitude, dishonesty, or corruption, *1088 and also any knowing misuse of the office, whatever the motive. However, these elements are not necessary to a finding of bad faith. A specific intent to use the powers of the judicial office to accomplish a purpose which the judge knew or should have known was beyond the legitimate exercise of his authority constitutes bad faith ...
Miss. Comm'n on Jud. Perform. v. Franklin, 704 So.2d 89, 92 ¶ 9 (Miss.1997) (quoting In re Quick, 553 So.2d 522, 524-25 (Miss.1989)). See also Miss. Comm'n on Jud. Perform. v. Gunn, 614 So.2d 387, 390 (Miss.1993); In re Anderson, 412 So.2d at 745. This Court has found that systematic patterns of misconduct can amount to willful misconduct in office. See, e.g., Miss. Comm'n on Jud. Perform. v. Willard, 788 So.2d 736, 742 ¶ 14 (Miss.2001) (ex parte communications); Spencer, 725 So.2d at 177-78 (offensive comments). This Court has found that "willful misconduct in office" also amounts to "conduct prejudicial to the administration of justice which brings the judicial office into disrepute," but we have expanded the definition of the latter to include cases where a judge has behaved with "negligence or ignorance not amounting to bad faith." Gunn, 614 So.2d at 390 (citing In re (Lloyd) Anderson, 412 So.2d 743, 745 (Miss.1982); and In re (William) Anderson, 451 So.2d 232, 234 (Miss. 1984)).
¶ 12. The Commission argues that the judge's pattern of not entering orders in a timely fashion and failure to exercise administrative control over the docket brought the integrity of the judiciary in question. The judge argues that this section of our Constitution does not proscribe activities by a judge, but rather establishes the Commission and sets its boundaries. The judge argues that there is no evidence of specific intent in the record to prove willful misconduct. Finally, the judge contends that the definition of "conduct prejudicial to the administration of justice" is too vague to enforce and the facts developed at the hearing, specifically the size of the judge's caseload and backlog of cases inherited when the judge assumed office are typical of judges around this state and do not warrant public reprimand. In mitigation, the judge cites regularly scheduled time for administrative duties as a corrective measure the judge implemented the following year to address the problem.
¶ 13. We find that the facts do not support a conclusion that the judge has engaged in willful misconduct. In two cases, the judge entered an order finally adjudicating the delinquent cases within ten days of receiving a letter of notice of a citizen's complaint from the Commission. There is also evidence in the record that the judge undertook to remedy the administrative situation once it became clear that it was a recurring problem. Attached to the judge's reply to the Complaint was an affidavit of a court reporter concerning the referenced case in Count One, which affidavit stated that the judge had requested the transcript in December of 2000, but the court reporter was unable to provide the transcript until July 16, 2001. Finally, in two other cases, the record reveals that the judge awaited an appropriate order from counsel before entering judgment, contributing to the length of the delays.
¶ 14. Aside from the number of complaints and the length of the delays, the Commission has not demonstrated that the judge's behavior was done willfully or with gross unconcern and generally in bad faith, a prerequisite for finding a violation of this constitutional clause. The Commission's failure to find the judge's conduct to be actionable under subsection (c) of Art. 6, § 177A [willful and persistent failure to perform the judge's duties], is either an inconsistent stance with respect to willfulness, *1089 or an oversight. In either case, we find the record does not support a finding of willfulness. The standard for willful misconduct has not been met. Therefore, we disagree with the Commission and find the Commission has failed to prove that the judge's conduct was actionable under subsection (b) of Article 6, § 177A, of the Mississippi Constitution.
¶ 15. On the other hand, there is sufficient evidence to find that the judge's conduct was actionable under subsection (e) of Article 6, § 177A: engaging in conduct prejudicial to the administration of justice which brings the judicial office into disrepute. It is clear from the record that the judge did not maintain adequate control of the docket so that the judge could enter orders in a timely fashion. As a trial judge, the chancellor in the case sub judice, by virtue of office, had the sole responsibility and authority to enter the orders. The judge's negligence created the delays in entering orders and resulted in considerable amounts of time elapsing before judgment was entered in the cases discussed above. Such delays are covered under the scope of subsection (e) and the effect of the delays brought the judicial office into disrepute. The number of complaints and the short length of time in which they were filed further magnify the serious nature of the judge's misconduct. With respect to the judge's claim that our Constitution does no more than create the Commission and establish its boundaries, not proscribe any behavior, this Court has held otherwise, finding § 177A gives it the power to impose sanctions. Cf. Miss. Comm'n on Jud. Perf. v. Carr, 786 So.2d 1055, 1058 ¶ 6 (Miss.2001) ("Section 177A of the Mississippi Constitution of 1890 authorizes this Court to sanction judges for `willful misconduct' in office or conduct which is prejudicial to the administration of justice which brings the judicial office into disrepute."). Therefore, we conclude that the judge's conduct was actionable under subsection (e) of Article 6, § 177A of the Mississippi Constitution.

B. CANON 1, CODE OF JUDICIAL CONDUCT
¶ 16. Canon 1 of the Code of Judicial Conduct reads:
An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective.
Miss.Code of Jud. Cond. Canon 1.[2] The Commission argues that the judge's pattern of delay in entering judgments and orders does not promote the public perception of an honorable judiciary. The judge argues that the behavior was not contrary to three of the principles in the rule independence, honor, and integritytherefore the judiciary has not been shamed nor has the judge acted with acquiescent callousness toward the judge's judicial duties.
¶ 17. We disagree with the Commission's conclusion that the judge has violated Canon 1. While this canon is often used as an expression of the overall thrust of the code, its language emphasizes failures which rise to the level of impugning the independence and honor of the judiciary. *1090 When we consider the facts and circumstances peculiar to this particular case as revealed in the record before us, we conclude that the judge's actions do not involve questions of independence, nor can these actions be characterized as being dishonorable in the sense that the judge was charged with, or found to have committed, a dishonest act. Of course here, there is no inference of a dishonest act committed by the judge. We thus find no Canon 1 violation.

C. CANON 2(A), CODE OF JUDICIAL CONDUCT
¶ 18. Canon 2(A) of the Code of Judicial Conduct states:
A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
Miss.Code of Jud. Cond. Canon 2(A). The commentary to this Canon provides:
Public confidence in the judiciary is eroded by irresponsibility or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. He must expect to be the subject of constant public scrutiny. He must therefore accept restrictions on his conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly....
The Commission argues that the judge's delays and the evidence of the complaints demonstrate how the judge has not promoted public confidence in the judiciary. The judge argues that impartiality and integrity were not questioned, thus the Commission's finding that the judge violated Canon 2(A) was groundless.
¶ 19. Again, we disagree with the Commission. The command of Canon 2(A) is patterned closely to that of Canon 1, especially where it calls upon judges to conduct themselves in a manner which promotes and maintains the public's trust in the judiciary. This is an extension of the call from Canon 1 that a judge maintain and observe a high standard of conduct for the benefit of the judiciary. Stated succinctly, the provisions of Canon 2A address conduct which promotes or fails to promote the integrity and impartiality of the judiciary. While the judge in the case sub judice clearly exhibited a lack of diligence and timeliness in the disposition of the subject cases, the facts as revealed in the record before us do not involve moral turpitude or bias so as to constitute a violation of this specific canon. Therefore, we conclude that the judge has not violated Canon 2(A) of the Code of Judicial Conduct.

D. CANON 3(A)(4) & (5), CODE OF JUDICIAL CONDUCT
¶ 20. Canon 3 of the Code of Judicial Conduct states in pertinent part:
The judicial duties of a judge take precedence over all his other activities. His judicial duties include all the duties of his office prescribed by law. In performance of these duties, the following standards apply:
....
(A) ...
(4) A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider ex parte or other communications concerning a pending or impending proceeding. A judge, however, may obtain the advice of a disinterested expert on the law applicable to a proceeding before him if he gives notice to the parties of the person consulted and the substance of the advice, and affords the parties reasonable opportunity to respond.

*1091 (5) A judge should dispose promptly of the business of the court.
Miss.Code of Jud. Cond. Canon 3(A)(4) & (5). The Commission argues the pattern of delays in this case violated this Canon and both subsections because the right to be heard necessarily involves a right to a prompt, timely disposition of matters and because the delays prove the judge did not dispose promptly of the business of the court. The judge basically concedes that the court's business was not disposed of in a timely fashion, but the judge argues that Canon 3(A)(4) was not violated because it proscribes ex parte communications.
¶ 21. We are constrained to find no violation of Canon 3(A)(4), but we do find that Canon 3(A)(5) has been violated. Seven citizens' complaints were received over the approximate span of one year, each concerning lengthy delays between a hearing on a motion and entry of judgment on that motion. However, the commentary to Canon 3(A)(4), when considered with the plain text of that subsection, indicates the conduct forbidden in Canon 3(A)(4) does not cover the misconduct in this case.
¶ 22. In the end, we find in today's case that the judge violated the clear and concise language of Canon 3(A)(5) ["A judge should dispose promptly of the business of the court"]. Again we read the commentary of the old Code in pari materia with the canon itself. The commentary states in toto:
Prompt disposition of the court's business requires a judge to devote adequate time to his duties, to be punctual in attending court and expeditious in determining matters under submission, and to insist that court officials, litigants and their lawyers cooperate with him to that end.
Here, the judge was mandated and obligated via this canon to expeditiously dispose of pending cases and to insist that all officials, including lawyers, cooperate to achieve this goal.
¶ 23. However, in so finding, we feel compelled to make these observations. We are concerned about the fact that the record before us reveals absolutely no effort by the parties and/or their attorneys to utilize the available provisions of M.R.A.P. 15, which rule provides a vehicle by way of mandamus to require a decision from the trial court in situations where, inter alia, a trial judge has taken a civil case under advisement. While the procedural provisions of M.R.A.P. 15 were amended effective, October 17, 2002, after the occurrence of the events discussed in today's case, even the provisions of M.R.A.P. 15 which were applicable and in existence at the time clearly provided an avenue for relief in the six cases which are the subject of the case sub judice. In fact, in two of the six cases, the complaints against the judge were filed prior to the expiration of the six-month period following the judge's taking the cases under advisement. In the remaining four cases, the complaints against the judge were filed 20 days, one month, two months, and four months after the expiration of the six-month period following the judge's taking the cases under advisement. While again, the facts and circumstances of today's case, when considered in conjunction with the applicable law, warrant a finding of violations of Canon 3(A)(5) of our Code of Judicial Conduct, and thus actionable pursuant to art. 6, § 177A of our state constitution, we are not about to embark upon a course of approving the utilization of judicial performance complaints against our trial judges in lieu of readily available remedies via mandamus for overdue trial court decisions. Without question, the decision in today's case is "fact-driven."
*1092 ¶ 24. We readily acknowledge the legitimate concerns which Justice Graves very ably conveys in his excellently written dissenting opinion. In fact, we find little disagreement with his dissent, other than the appropriate disposition of today's case. However, we note our observations made in a recent case:
While there may be concern that the very nature of appellate review results in this Court viewing [the judge's] actions in the cool light of after-the-fact reflection by way perhaps of second-guessing her judicial actions taken in what she perceived to be an emergency situation, we note that a sitting chancellor presided over the Committee hearing. Additionally when the Commission convened to consider [the judge's] case, the Commission meeting was presided over by a sitting circuit judge, and there were also present two sitting county court judges, a sitting chancellor and one other sitting circuit judge. A chancellor made the motion to adopt the Committee's findings of fact, but not to accept the Committee's recommendation for a public reprimand, but instead to recommend to this Court, inter alia, a 30-day suspension. The chancellor's motion was unanimously passed by the Commission. While this Court is the ultimate arbiter of Commission complaints against our judges, we afford deference to the Commission's findings of fact and recommendations when such findings, as here, are supported by clear and convincing evidence; and we also note that in today's case, our learned trial judge-members on both the Committee and the Commission found [the judge's] actions to be in violation of our judicial canons and sanctionable. (footnote omitted).
Miss. Comm'n on Jud. Perf. v. Perdue, 853 So.2d 85, 97-98 (Miss.2003).[3]
¶ 25. As in Perdue, we likewise note that in the case sub judice, when the Commission convened to consider the judge's case, the Commission meeting was presided over by a circuit judge, and in addition to the lawyer members and lay members of the Commission, there were also present two chancellors, two county court judges, a circuit judge, and a justice court judge, some of whom were serving as alternates. The Commission, on a 6-1 vote, decided to recommend to this Court that the subject judge be publicly reprimanded. While again acknowledging Justice Graves's concerns as set out in his dissent, the record before us today reveals that when confronted with the compelling evidence of the judge's conduct in the case sub judice, most, if not all, of the trial judges on the Commission who voted in this case, voted to publicly reprimand the subject judge.[4] Thus, while we are not bound by the Commission's findings and recommendations, when the Commission's findings are based on clear and convincing evidence, we afford great deference to the Commission's findings and recommendations. Miss. Comm'n on Judicial Performance v. Lewis, 801 So.2d 704, 707 (Miss.2001); Miss. Comm'n on Judicial Performance v. Bishop, 761 So.2d 195, 198 (Miss.2000).
¶ 26. Justice Graves correctly states that the appropriate method of addressing late decisions from our trial judges is via mandamus. We simply reiterate here that the decision today is fact-driven, and we remind the trial bar that except in very *1093 rare cases, a judicial performance complaint is a highly inappropriate method of addressing perceived inaction on the part of our trial judges.

II. WHETHER A PUBLIC REPRIMAND, $500.00 FINE, AND PAYMENT OF THE COSTS OF THE PROCEEDING IS AN APPROPRIATE SANCTION.
¶ 27. The Commission argues that the judge's misconduct in these cases was extremely serious. It states that a single instance of delay might have warranted a private reprimand, but the pattern established here warrants a public reprimand. The judge only takes issue with the imposition of a public reprimand. The judge argues that the misconduct does not warrant this sanction, but the judge is silent as to the fine and imposition of costs.
¶ 28. This Court has established guidelines for determining when a public reprimand is warranted. In Mississippi Commission on Judicial Performance v. Walker, 565 So.2d 1117, 1125 (Miss. 1990), this Court articulated those guidelines:
(1) The length and character of the judge's public service;
(2) Positive contributions made by the judge to the courts and the community;
(3) The lack of judicial precedent on the incident in issue;
(4) Commitment to fairness and innovative procedural form on the part of the judge;
(5) The magnitude of the offense;
(6) The number of persons affected; and
(7) Whether "moral turpitude" was involved.
(citing In re Baker, 535 So.2d 47, 54 (Miss. 1988)). The Commission also refers this Court to two opinions from sister jurisdictions concerning sanctions for judicial misconduct, portions of which are worth echoing here:
The purpose of sanctions in cases of judicial discipline is to preserve the integrity and independence of the judiciary and to restore and reaffirm public confidence in the administration of justice. The discipline we impose must be designed to announce publicly our recognition that there has been misconduct; it must be sufficient to deter respondent from again engaging in such conduct; and it must discourage others from engaging in similar conduct in the future. Thus, we discipline a judge not for purposes of vengeance or retribution, but to instruct the public and all judges, ourselves included, of the importance of the function performed by judges in a free society. We discipline a judge to reassure the public that judicial misconduct is neither permitted nor condoned. We discipline a judge to reassure the citizens of Nebraska that the judiciary of their state is dedicated to the principle that ours is a government of laws and not of men. See, Disciplinary Proceeding Against Buchanan, 100 Wash.2d 396, 669 P.2d 1248 (1983); Matter of Ross, 428 A.2d 858 (Me.1981).
In re Kneifl, 217 Neb. 472, 351 N.W.2d 693, 700 (Neb.1984). "In determining an appropriate discipline in cases of judicial misconduct, our primary concern is to provide sanctions sufficient to restore and maintain the dignity and honor of the judicial office and to protect the public against future excesses. Each case must be judged in light of its own particular circumstances." In re Harned, 357 N.W.2d 300, 302-03 (Iowa 1984). The Commission also analogizes judicial discipline to attorney discipline and notes their similarities. See, e.g., Miss. Bar v. Hall, 612 So.2d 1075, 1077-78 (Miss.1992). The similarities are *1094 useful in determining an appropriate sanction, but this Court is not bound by the precedents in attorney discipline matters when confronted with judicial discipline.
¶ 29. The Commission submits that there is no specific case law in Mississippi concerning discipline for failing to enter orders in a timely fashion, nor does the Commission point to any other jurisdiction for support of a public reprimand. We can find no similar case in our jurisprudence; therefore, we turn to other jurisdictions for guidance.
¶ 30. The Louisiana Supreme Court publicly censured a trial court judge for failing to enter judgments in two cases and for failing to report them taken under advisement as required by statute. In re Tuck, 683 So.2d 1214 (La.1996). Twenty-one months passed between trial and entry of judgment in one case, almost six years passed between trial and entry of judgment in the other. Id. at 1216. The Court utilized a commendable list of six factors to consider when determining whether a trial court judge should be sanctioned for delays in entering judgment. Id. at 1218. Concerning a judge's reliance upon lawyers for submitting appropriate orders for consideration, the Louisiana Supreme Court stated:
Moreover, because lawyers frequently are the dilatory ones and tend, in explaining to their clients, to blame judges for the delay, it is important for judges in most cases to abide by the time standards guidelines, especially in the trial court where the court's primary function is finding facts and applying the applicable law, and not one of making weighty pronouncements of law binding throughout the circuit.
Id. The determining factor for imposing the public censure was the failures to report the cases as taken under advisement. Id. at 1219.
¶ 31. On the other hand, the Court of Appeals of New York chose not to impose a public censure or charge with the costs of the appeal a trial court judge whose delays in rendering decisions ranged from seven months to nine years in eight cases pending before him. In re Greenfield, 76 N.Y.2d 293, 558 N.Y.S.2d 881, 557 N.E.2d 1177 (1990). The Court said, "a Judge's failure to promptly dispose of pending matters generally does not warrant `judicial discipline but rather administrative correction' (quoting In re Alvino, 100 N.J. 92, 494 A.2d 1014, 1016)." In re Greenfield, 558 N.Y.S.2d 881, 557 N.E.2d at 1179. The New York court further stated:
We have concluded that generally these matters can and should be resolved in the administrative setting and that the more severe sanctions available to the Commission should only be deemed appropriate and necessary when the Judge has defied administrative directives or has attempted to subvert the system by, for instance, falsifying, concealing or persistently refusing to file records indicating delays.
Id. at 1179-80. We find these cases represent the spectrum of options available to us in this case and look to them, and others like them, for direction as to any punishment we may impose. See also Russell G. Donaldson, Removal or Discipline of State Judge for Neglect of, or Failure to Perform, Judicial Duties, 87 A.L.R.4th 727, § 8 (2004).
¶ 32. Here the judge served one term as a chancery court judge.[5] The record does not reflect further public service although the judge's brief addresses this issue. The record likewise does not contain any information concerning positive *1095 contributions the judge has made to the community, but the judge again addresses this issue in the brief. The Commission acknowledges that this misconduct does not involve moral turpitude. The evidence of misconduct in the record does not demonstrate a lack of fairness, but it does reveal poor procedural form on behalf of the court. The magnitude of the offense is hard to measure, and the record contains little more than the complaint as evidence in regards to this, but the parties in the cases discussed above were obviously affected as well as other persons incidentally affected by the delays. The fact that several delays prompting complaints occurred within a short amount of time amplifies the magnitude of the misconduct because it demonstrates a recurring pattern of neglect.
¶ 33. The judge's reliance upon other attorneys to submit adequate orders for entry does not excuse the judge's misconduct. These facts we treat as mitigating evidence of the judge's culpability, but we also again note that Canon 3(A)(5) clearly imposed upon the judge the obligation to expeditiously decide pending cases and to insist that lawyers timely submit proposed orders for entry.
¶ 34. The judge argues that public reprimands are not appropriate for judges who have only committed one type of offence. Cf. In re Baker, 535 So.2d at 53 ("A survey of recent Mississippi judicial disciplinary cases (see Appendix) reveals that the sanction of public reprimand is imposed for more than one offense. Only one case, In re William Anderson, involved a public reprimand for only one type of offense. Even in this case, Judge Anderson failed on three occasions to issue writs of garnishment after receiving filing fees to do so. We find no case in which one isolated instance of impropriety warranted public censure.") (citing In re Anderson, 447 So.2d at 1275) (emphasis in original). Of the cases the Commission cites to support a public reprimand for judges who have failed to perform their duties, both involve multiple offences of different types. See Spencer, 725 So.2d 171 (offensive comments, ex parte communications, failures to sign cases and act on affidavits); In re Quick, 553 So.2d 522 (did not report dispositions of 28 D.U.I. cases or 552 traffic tickets). We have previously concluded that this misconduct was not done willfully. The judge is no longer on the bench. Finally, the remedial steps taken by the judge after the time period covering this misconduct appear to have solved the problem.
¶ 35. However, the harm done to the public perception of the judiciary is tangible and not easily counteracted when justice is delayed. While the judge is no longer on the bench, it is important for the parties to litigation in our courts and those incidentally affected to know that delays between hearings and entry of orders should be avoided so as to restore and maintain confidence in the judiciary.
¶ 36. The record in this case shows that the judge failed to maintain control of the docket and schedule adequate time for writing and issuing opinions and orders. Sanction of this misconduct is appropriate in this case. However, we conclude that the misconduct was not done willfully as evidenced by (1) the quick remedial steps taken by the judge before and after receiving the notices of complaints in two cases, (2) the reliance upon attorneys in two other cases to furnish orders, (3) the delay caused by the production of the transcript in one case, and (4) the remedial steps taken the following year to schedule adequate time for writing and issuing orders. Finding this misconduct not to be willful, we find that the appropriate sanction is a *1096 private reprimand with the costs of this appeal taxed to the judge.

CONCLUSION
¶ 37. Having duly considered the above facts and authorities, we conclude that the judge's conduct was actionable under Art. 6, § 177A(e) of our Constitution, and violative of Canon 3(A)(5) of our former Code of Judicial Conduct due to the failure as a sitting chancellor to issue opinions and orders in a timely fashion in six cases over the time span of one year. The appropriate sanction for this misconduct is a private reprimand and taxing the judge with the costs of this appeal.
¶ 38. FORMER JUDGE U.U. SHALL BE PRIVATELY REPRIMANDED AND ASSESSED COSTS OF $953.95.
SMITH, C.J., WALLER AND COBB, P.JJ., EASLEY AND RANDOLPH, JJ., CONCUR. RANDOLPH, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY SMITH, C.J., COBB, P.J., EASLEY AND CARLSON, JJ. GRAVES, J., DISSENTS WITH SEPARATE WRITTEN OPINION. DICKINSON, J., DISSENTS WITH SEPARATE WRITTEN OPINION. DIAZ, J., NOT PARTICIPATING.
RANDOLPH, Justice, Specially Concurring.
¶ 39. I concur in the majority opinion but write separately to add these comments. Article 6, Section 177A of our state constitution provides in part:
On recommendation of the commission on judicial performance, the supreme court may remove from office, suspend, fine or publicly censure or reprimand any justice or judge of this state for: (a) actual conviction of a felony in a court other than a court of the State of Mississippi; (b) willful misconduct in office; (c) willful and persistent failure to perform his duties; (d) habitual intemperance in the use of alcohol or other drugs; or (e) conduct prejudicial to the administration of justice which brings the judicial office into disrepute; and may retire involuntarily any justice or judge for physical or mental disability seriously interfering with the performance of his duties, which disability is or is likely to become of a permanent character.
Miss. Const. Art. 6 § 177A (1890) (emphasis added)
¶ 40. In applying the law, courts typically consider the underlying purpose and policy motivating the enactment of such law. That said, this Court previously stated:
The purpose of sanctions in cases of judicial discipline is to preserve the integrity and independence of the judiciary and to restore and reaffirm public confidence in the administration of justice. The discipline we impose must be designed to announce publicly our recognition that there has been misconduct; it must be sufficient to deter respondent from again engaging in such conduct; and it must discourage others from engaging in similar conduct in the future. Thus, we discipline a judge not for purposes of vengeance or retribution, but to instruct the public and all judges, ourselves included, of the importance of the function performed by judges in a free society. We discipline a judge to reassure the public that judicial misconduct is neither permitted nor condoned. We discipline a judge to reassure the citizens of [Mississippi] that the judiciary of their state is dedicated to the principle that ours is a government of laws and not of men.
Mississippi Comm'n on Judicial Performance v. Guest, 717 So.2d 325, 329 (Miss. *1097 1998)(citations omitted) & (emphasis added).
¶ 41. To my mind, there is no doubt that the authority of the Commission on Judicial Performance includes the ability to investigate and make recommendations regarding any allegation of wrongful conduct committed by a judge while in office. The jurisdiction provided under § 177A is not so strictly limited to divest the Commission's authority, and that of this Court, at the moment an accused judge ceases to be in office. The fact that a judge has departed office does not render the conduct any less wrongful, less worthy of discipline, or less worthy of public recognition that there has been misconduct.
SMITH, C.J., COBB, P.J., EASLEY AND CARLSON, JJ., JOIN THIS OPINION.
GRAVES, Justice, Dissenting.
¶ 42. I am compelled to write separately in order to address a deviation from our Rules of Appellate Procedure which results in placing an even greater burden on our trial courts than the pressures they already face. The judge in this case faced a backlog of 41 cases, which the Commission for Judicial Performance characterized as "certainly" a "busy" caseload. Despite this concession, the Commission "did not find credible [the judge's] allegation that [there was] no time to write opinions," and suggested writing "on nights and weekends." All of those cases, save one, were inherited from the previous judge's docket.
¶ 43. Sometimes those nights and weekends are indeed lost to the demands of the bench. Yet the retort of the Commission to work on the weekends ignores that the problem of the backlog was left unsolved. The cases progressed no further when the judge was brought before the Commission. We are penalizing the judge instead of aiding in the execution of fair and timely adjudication. That is not the proper route for clearing a backlog of cases and fails to remedy the situation.
¶ 44. We have already created a remedy for this problem: the writ of mandamus. At the time these proceedings were commenced in 2002, our Rule of Appellate Procedure 15(a) described a very detailed procedure that parties should follow "[i]f a trial judge in a civil case fails to render a decision on a motion or request for relief which would be dispositive of all the claims or the rights and liabilities of all the parties, within six (6) months after taking such a motion or request under advisement..."[6] In the words of the modern comment to the rule, this procedure is critical because it "recognizes the importance of prompt disposition of matters submitted to the courts for decision and ... accord[s] with M.R.C.P. 1 in its dictate that the rules be construed to secure just, speedy and inexpensive determination of actions, and with Section 3A(5) of the Code of Judicial Conduct which requires that judges promptly dispose of the business of the courts." M.R.A.P. 15. cmt.
¶ 45. In the instant case, the Commission recommended disciplinary action because of complaints generated by six cases. Neither the lawyers nor the litigants in *1098 any of those cases sought relief by way of a writ of mandamus. Certainly, anyone with enough savvy to learn about and employ the resources of the Commission was aware of the provisions of M.R.A.P. 15.
¶ 46. We have so carefully delineated and refined the mandamus process for two reasons: first, to accord to the parties an opportunity to secure a just, speedy, and inexpensive disposition of their cases. Less importantly, but still critical, M.R.A.P. 15 provides the judge with an administrative alert that a ruling is past due and provides them with an opportunity to cure that problem. For "[t]he trial judge, not later than thirty (30) days prior to the expiration of the six (6) months from the date the case was taken under advisement, for just cause shown, may apply in writing to the Supreme Court for additional time beyond said six (6) months in which to enter a decision." M.R.A.P. 15(b).
¶ 47. This assists the entire justice system, because "[t]he writ of mandamus is an aid to the appellate process, because it directs an inferior tribunal to take some action so its judicial decision can be reviewed on appeal." In re Chisolm, 837 So.2d 183, 189 (Miss.2003); see also S.C.R. v. F.W.K., 748 So.2d 693, 702 (Miss.1999) ("The purpose of Rule 15 is `to assure that a trial court will promptly render judgment in a case and thus terminate the litigation or trigger the appellate process' ") (quoting Crocker v. Commercial Nat'l Bank & Trust Co., 455 So.2d 1309, 1311 (Miss.1984)). "The proper function of mandamus is to supply a remedy for inaction..." Chisolm, 837 So.2d at 189 (emphasis added). The ultimate "function of the rule is reduction of delay, increase of judicial efficiency and economy and procedural safeguards for litigants." Crocker, 455 So.2d at 1311.
¶ 48. The majority's decision today ignores this important rule and disregards a process which has been part of Mississippi legal practice for over one hundred and seventy years. The first reference to compelling a judge through mandamus occurs in Ex Parte Robson, 1 Miss. 412 (1831).[7] While we declined to compel the judge in that case to issue a bill of exceptions, there was "no doubt of the power of this court to grant the writ, in a case like the present." Id.
¶ 49. That venerable power of this Court should have been exercised in the instant case. If the attorneys in the cases which triggered this action had filed for a writ of mandamus, then litigation could have moved forward. Instead, complaints were filed against the judge. Hence, instead of handling the court's crowded docket, the judge was forced to deal with responding to a premature complaint. The filing of a complaint with the Commission should be a last resort if the gravamen of the complaint is the judge's failure to timely rule on a pending matter.
¶ 50. It is also important to remember the dangers of penalizing our trial judges for a backlog they may not even have created. Instead of issuing reprimands to judges who have been untimely in rendering orders or writing opinions, we should determine if it is appropriate to offer some form of assistance to relieve the burden.
¶ 51. This case involves a critical weakness in any judicial system: the ability to efficiently and fairly administer justice. We should not coddle the trial courts, but we should be mindful of the great burdens that are placed on them by increasingly *1099 complex litigation and spiraling dockets. The majority's opinion does not ease those burdens, but instead creates a danger that any failure to render a timely order or opinion might trigger a complaint and investigation before the Commission. If the sole concern of those who filed complaints against the judge herein was the receipt of a timely ruling, they should have filed for a writ of mandamus. The appropriate relief was to seek a ruling by the court and the appropriate vehicle to seek that ruling is through the petition for mandamus. Sanctions are not proper. This process was not followed, and because it was not followed in the case at hand, I respectfully dissent.
DICKINSON, Justice, Dissenting.
¶ 52. While I agree that the judge's conduct in the case sub judice would warrant reprimand if the judge were still in office, my strict constructionist view of the punitive, constitutional provision involved requires me to respectfully dissent.
¶ 53. The majority issues a private reprimand under authority of Art. 6, § 177A, of the Mississippi Constitution. That provision provides in relevant part: "[o]n recommendation of the commission on judicial performance, the supreme court may remove from office, suspend, fine, or publicly censure or reprimand any justice or judge of this state ..." The Constitution refers only to "any justice or judge," and not to any "former justice or judge." Thus, in order to discipline a "former" judge, one must read into § 177A something which is not there.
¶ 54. This Court has, in past opinions, simply assumed that § 177A applied to former judges. See, e.g., Mississippi Comm'n on Judicial Performance v. Teel, 863 So.2d 973 (Miss.2004). This is so, I believe, because no Mississippi case could be found where any party presented the precise issue to the Court. Other jurisdictions, however, have addressed the issue. In Rosasco v. Commission on Judicial Performance, 82 Cal.App.4th 315, 98 Cal. Rptr.2d 111 (2000), the Court of Appeal in California discussed a provision of the California constitution which provided for discipline of "judges" by the California Commission on Judicial Performance. Because the provision could not be applied to "former judges," the citizens of California amended the constitution by removing the term, "judges," and inserting the term, "judges and former judges." Prior to the amendment, the California courts interpreted the provision as applying only to sitting judges. So should we.
¶ 55. I am certain that, had the majority drafted the Mississippi Constitution, the provision would have clearly provided for discipline of judges and former judges. The failure to include "former judges" was, doubtless, a mistake. However, it is not within this Court's authority to correct the mistakes, or perceived mistakes, of the drafters.
¶ 56. Stated another way, I have serious doubts about whether the Constitution grants this Court the power to discipline former occupants of the bench. Therefore, I cannot join the majority's opinion. However, I do agree with Justice Carlson and the majority that the judge in this case violated the duties of her office and, were she still an occupant of that office, I would concur with Justice Carlson's well-reasoned conclusion as to punishment.
¶ 57. I also note that, while a motion for writ of mandamus under M.R.A.P. 15 may have been a better avenue for relief in this case, the fact that the complainants did not attempt to access that remedy can not, in my opinion, prevent them from filing a complaint with the Commission. It seems to me the right to do so is constitutional.
*1100 ¶ 58. For the reasons stated, and with great respect for the majority's wisdom and experience with such matters, I dissent.
NOTES
[1] The complaint also sought sanctions for an alleged ex parte communication which the judge supposedly made in this case. The Commission ultimately concluded this allegation was not adequately supported by the record.
[2] The misconduct in this case occurred before the April 4, 2002, adoption of the new Code of Judicial Conduct. The judge's conduct will be evaluated under the old Code using the old Code Canon numbers and text of the Canon and commentary. We also remind the reader that the old Code did not contain gender-neutral language, whereas the current Code does.
[3] This was a 3-2-4 (plurality) decision of the Court.
[4] The record before us does not reveal who the lone dissenter was in the case before the Commission.
[5] The judge chose not to stand for reelection and has left office.
[6] That section of the rule was amended, and currently reads "[w]hen a trial judge in a civil case takes under advisement a motion or request for relief which would be dispositive of any substantive issues and has held such motion or request under advisement for sixty (60) days ..." The rule has thus expanded in two ways to serve even more situations than the old rule. First, mandamus may now be requested in situations that are not dispositive of "all" the claims of the parties; secondly, mandamus may be requested after sixty days instead of six months.
[7] The first reference to the general concept of mandamus is in dicta in Runnels v. State, 1 Miss. 146, 147 (1823).